IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

RAE McCANN,

                              Plaintiff,

            v.                                              OPINION and ORDER

BADGER MINING CORPORATION,                                  18-cv-73-jdp

                              Defendant.

---

This is an employment discrimination case brought under the Americans with Disabilities Act and the Age Discrimination in Employment Act. Plaintiff Rae McCann worked as a laboratory technician for Badger Mining Corporation until her position was eliminated as part of a company-wide reduction in force in October 2015. McCann alleges that Badger Mining included her in the reduction in force because of a disability related to hand and wrist pain and because she was 62 years old at the time of the layoff.

Badger Mining seeks summary judgment on all of McCann's claims. Dkt. 32. The court concludes that McCann has failed to adduce evidence sufficient to permit a reasonable jury to infer that Badger Mining included McCann in the reduction in force because of her hand condition or her age. Rather, the record demonstrates that Badger Mining management had concerns about McCann's ability to self-direct and troubleshoot, adapt to changes in the workplace, and work collaboratively with her teammates. Because McCann has not adduced evidence from which a reasonable jury could infer that Badger Mining's reasons are a pretext for discrimination, the court will grant Badger Mining's motion for summary judgment.

UNDISPUTED FACTS

The following facts are undisputed unless otherwise noted.

## A.  McCann hired as a lab technician

Atlas Resin Proppants was a Wisconsin-based company that produced coated sand products for use in the natural gas industry and various other industrial applications. In 2010, Atlas hired plaintiff Rae McCann, then 56 years old, as a laboratory technician in the company's production department. In early 2013, McCann, then 59, applied for and was selected to fill a vacant laboratory technician position on Atlas's research and development (R&D) team. As an R&D laboratory technician, McCann was responsible for assisting in the company's product development and optimization efforts. McCann reported to Cathleen Hegge, the Vice President of R&D.

## B.  2013 performance review

Hegge prepared McCann's 2013 performance evaluation. McCann's overall rating for the year was "right on track," which was the second highest of four possible ratings. The evaluation rated her across nine "competencies": "safety/environmental," "quality," "team player," "ethics and respect," "communication," "problem solving & decision making," "continuous improvement," "skills and knowledge," and "initiative/drive." She received the highest of four possible ratings for "safety/environmental," "quality," "team player," and "initiative/drive," and the second highest rating for the other five categories.

Hegge included the following comments in the evaluation:

- [S]he often asks for further direction and specifications on the work she is doing.

- Rae can be very kind and uses humor to relate to others. She does fine until someone upsets her and then she doesn't do

well with conflict. This cause[s] problems for her and others working with her.

- Rae communicates well most of the time. If a conflict occurs, she avoids the situation, but continues to be upset by it. (EX: Lab location recently) It takes her a long time to speak up.

- Rae understands the duties of a lab tech and does them well. Some new things are alarming to Rae, (changes in documentation and routine) but she does get there. She does seek to understand others jobs and challenges, but as stated before, if an initial interaction does not go well on solving a conflict between the two, Rae often gives up and resorts to talking it up to others.

Dkt. 42-3, at 2–3.

## C. Change in management

In May 2014, Atlas terminated Hegge over performance concerns. Erica Grant, an operations leader, assumed oversight of the R&D department. At the time of this transition, the R&D department comprised five individuals: two laboratory technicians—McCann and Penny Higley; one research analyst—Kimberly Breid; a conductivity and calibration technician—Kory Kowahl; and an engineer—Weston Lewis. Breid became Grant's second in command and assumed responsibility for directly supervising McCann.

## D. Performance concerns in 2014

Breid believed that McCann had "issues with teamwork, temperament, [and] getting along with people"—specifically Kowahl and Higley. Dkt. 26 (Breid Dep. 17:18–19). Other members of Atlas's leadership team shared similar concerns about McCann's perceived negativity. For example, on June 3, 2014, Grant emailed Atlas's leadership team to say that it was becoming apparent that there may not be a need for a full-time R&D laboratory technician in McCann's role, and proposing the creation of a "floating position" that would fill in for

3

missing laboratory technicians and do R&D testing as needed. Dkt. 37-1, at 2. Joe Knutson, a

"plant coach" in the production department where McCann had formerly worked, responded:

> Does anyone have concerns about Rae's negativity possibly spreading if she were to be in a floating position and seeing more people? I know this is being coached but the potential may increase. I don't want this email to come off negatively. Rae does [] well with the technical part of her job. We have a unique opportunity to utilize her talents in the best way possible for Atlas. I just had a few concerns to get off my chest.

*Id.* at 1.

Similarly, on June 15, 2014, Julie Casperson, Atlas's human resource manager, emailed

Grant and Knutson about negative feedback she had received about McCann from Tammy

Getter, a lab coach and McCann's former supervisor in the production department. *See* Dkt.

37-2, at 1 ("Tammy shared that she does not want Rae on her team as she is nothing but gossip

and negative attitude."). A few days later, Grant received additional negative feedback about

McCann from an outside HR consultant, Amy Biersteker. In an email update about a

team-building exercise she had conducted with the R&D team, Biersteker wrote that there had

been "a tense moment when Rae and Penny [Higley] really went at each other" and that

Biersteker had given them "both feedback privately on the inappropriateness of their

interactions and the need to address issues not attack the person." Dkt. 37-3, at 1.

**E. 2014 performance review**

In March of 2015, Breid and Grant provided McCann a written performance appraisal

of her work during the 2014 calendar year. McCann received the highest possible ratings in

"safety/environmental" and "quality," and the second highest rating in "team player," "problem

solving & decision making," "continuous improvement," "skills and knowledge," and

"initiative/drive." But she received the second lowest rating in "ethics and respect" and "communication," indicating that she only "sometimes" demonstrated mastery in those areas.

Breid included the following comments in the evaluation:

- Can be abrasive to team members she feels have wronged her without discussing issue with team member. Has let bad rapport with different team members affect rapport with other teams. I.E. When Penny and Rae were having problems pulled other R & D Team members into problem plus lab techs.

- Rae can come off a bit blunt at times. While some people find it refreshing, others can be a bit put off. Her heart is in the right place, but Rae does need to understand that some people take a gentler approach when pointing out a fault or mistake. When there are disagreements or arguments, they ought to be resolved with the other party and/or the appropriate coach(es), with effort put in to ensuring no one else becomes aware/part of the problem. Along the same lines of bringing up concerns to the right people Rae also needs to stay out of other people[']s issues. If the conflict does not involve her she needs to show respect and stay out of the problem not try to bring more people into the conflict. That being said folks have expressed that Rae has gotten better throughout the year and has been less confrontational and less of a pot stirrer.

- Keeps excellent records and follow instructions exactly. Whenever a particular test produces an unexpected result, she contacts the sample owner promptly for instruction and makes any required changes. That said, Rae seems to struggle with [] listening and understanding when other people communicate with her. I have been a witness to a conversation between Kory [Kowahl] and Rae where Kory told her exactly what he was going to do, and Rae advised that wouldn't work and a half hour later they decided on the action that Kory had originally said. If a communication is not how Rae was expecting it she has trouble understanding. I feel that if everything isn't written down in the exact right order Rae will have questions and not proceed until they are answered.

Dkt. 42-4, at 2.

## F.  Merger with Badger Mining

In late 2014, oil prices fell dramatically, triggering a drop in the demand and price for Atlas's sand-coated products. As a result, Atlas merged with its sister company, defendant Badger Mining Corporation, in April 2015. McCann retained the same position at Badger Mining.

## G.  Batch mixing duties

Following the merger, Breid and Lewis, the R&D engineer, were shouldering multiple responsibilities, including "batch mixing," the time-consuming process of mixing new lab-batches of resin-coated products. To provide some relief to Breid and Lewis, Grant decided that someone else should be trained to handle batch mixing. So in July 2015, Breid trained McCann on the batch-mixing process, demonstrating the mixing steps and providing McCann an opportunity to mix under her supervision and ask questions as they came up. After that training session, McCann was asked to perform the task on her own.

The parties dispute how McCann handled the batch mixing. Badger Mining contends that McCann could not competently perform the batch-mixing responsibilities. Breid testified that McCann was tasked with mixing two or three recipes during an overnight shift, but that she was only able to complete one of them because she had numerous questions regarding the timing, amounts, and chemicals used. *See* Dkt. 26 (Breid Dep. 14:7–15:12). McCann says that she was only ever asked to mix one batch, that she found it to be easy, and that she did not ask Breid any questions during the process. Dkt. 68, ¶¶ 9, 10. She later asked Breid whether she wanted her to mix additional batches, and Breid told her that she should focus on running ISO test crushes, which was another priority project in R&D.

In the summer of 2015, Grant and Breid began discussing the possibility of bringing in another lab technician to take on batch mixing responsibilities.

## H. McCann develops hand and wrist pain

Throughout 2015, McCann experienced issues with her hands and wrists. Specifically, her fingers would cramp up, and she would experience numbness in her fingertips upon waking and achiness by the time she got off work. Dkt. 89, ¶ 36. As a result of her pain, McCann was no longer able to crochet, knit, and paint. She also had to start taking breaks when writing, driving, and mowing her lawn to ease her symptoms. For example, when McCann would drive for more than 35–40 minutes at a time her hands would hurt and become numb, and she would have to stop driving for 15–20 minutes to rest her hands. *Id.* ¶ 38. But the pain did not interfere with McCann's ability to do her job at Badger Mining. Dkt. 92, ¶ 72.

After her symptoms began worsening in September 2015, McCann sought medical treatment. Her providers noted that her x-rays showed signs of arthritis and degenerative changes, and they suggested that McCann may have carpal tunnel. They prescribed her medications and provided cortisone injections, but did not provide any work restrictions for her.

On September 21, McCann emailed Breid, Grant, and Casperson, stating that she had "Carpal Tunnel in both hands, Arthritis in most all the joints in both hands, and Deterioration of the cartilage, in both thumbs and one finger." Dkt. 42-11, at 1. She informed them that she would likely need time off for at least two surgeries and multiple doctors' appointments. The next day, Casperson replied: "Thanks for the updates. Sorry to hear you have been having so much pain with your hands. I am copying Greta on this response as you should probably get some paperwork started for FMLA and short term disability. Greta will follow up with you on

what is needed." Dkt. 69-5, at 1. Casperson copied Greta Gearing, the Badger Mining employee who handled FMLA and benefits-related issues. But McCann didn't receive any FMLA or short-term disability paperwork from Gearing or anyone else. On September 25, Breid responded to McCann's September 21 email, assuring her that they would "make the schedule work so you can take the time off you need." Dkt. 42-12, at 1.

In the days following McCann's disclosure of her hand condition, Casperson made efforts to determine whether McCann's condition was related to her job duties. On September 22, she emailed Breid to ask whether McCann had "at any time said [that] this is work related?" Dkt. 69-11, at 1. Breid replied: "She has stated that it seems to be worse after doing the crush testing. This test requires hand strength. When she was first talking about her hands she thought it could be from doing that test." *Id.* Casperson then mimicked a crush test to see what it involved. In a September 30 email to Beth Nighbor, Badger Mining's Associate Development Leader, Casperson wrote:

> Kim [Breid] showed me the cells Rae is talking about and I mimicked a test too, just to understand what she means. The cells do feel heavy initially but felt lighter the 2nd and 3rd time I picked them up (they are the 7.4 lbs Rae said). These cells are part of the job requirement for all Lab Techs, including in R&D. There has been increased testing requirements, but she said Rae has been doing this for a long time. . . . My guess would be that the repetition of the job is what has caused her hand trouble (although she has said that she already had arthritis in her hands). So that wouldn't be a report of injury from the job but more related to job repetition.

Dkt. 69-13, at 1–2. In an effort to address these issues, BMC raised the height of McCann's work surface and developed a device that would allow her to conduct crush tests without having to use her fingers to push or pull.

## I. McCann is offered early retirement

Business conditions continued to deteriorate, and on September 29, 2015, Badger Mining offered early retirement to 21 employees over the age of 60, including McCann. McCann was given two weeks to decide whether to take the offer. *See* Dkt. 42-14. She did not immediately respond.

## J. Nate Coblentz transfers to the R&D team

While McCann's offer of early retirement was pending, there was a change in the composition of the R&D department. Earlier in the year, Grant and Breid had spoken with two lab coaches in the production department, Lisa Rodriguez and Rhonda Miller, about whether it would be feasible to transfer a lab tech into the R&D department to assist with batch mixing. Both Rodriguez and Miller named Nathan Coblentz, a production lab tech, as a candidate who would be a good fit for R&D. In September 2015, Grant met with Coblentz to discuss the transfer, and he indicated that he was eager to join R&D. On September 22, 2015, the day after receiving McCann's email about her likely medical-related absences from work, Grant emailed Breid regarding her discussion with Coblentz:

> Nate was at Taylor today and I mentioned to him that Rae would be in and out for the next few months (I didn't say why) and we might need some help. I told him I didn't want to step on your toes and that I hadn't officially talked to you on this yet but that you would be around tomorrow and we would discuss further. He was very interested and just ask that we keep Rhonda and Lisa in the loop if this is something you decide would make sense.
>
> Hopefully I didn't overstep my bounds here. We can discuss further in the morning.

Dkt. 69-7. Grant ultimately expedited Coblentz's transfer to ensure adequate coverage based on her understanding that McCann would likely need some time away from work for medical reasons.

On October 5, Breid emailed McCann to tell her that they had transferred Coblentz to R&D, where he would "focus on mixing batches." Dkt. 42-13, at 1. The next day, McCann met with Breid in person to ask whether Coblentz was "coming in to take [her] place" in R&D. Dkt. 30 (McCann Dep. 192:20). Breid told McCann that they had decided to officially transfer Coblentz to R&D in part because they "didn't know what was happening with [McCann's] hands or if [she was] going to take the early retirement," and because Coblentz had "more of the skill set" they were looking for in R&D. *Id.* 192:23–25; 193:2–3. McCann expressed concern that Badger Mining was trying to replace her due to her hand issues and told Breid that she was going to speak to HR.

McCann then went to speak with Casperson in her office. She recounted what Breid had said and asked whether Coblentz was being brought in to replace her. Casperson said she didn't know, and then asked whether McCann would be interested in transferring back to the production department if Badger Mining could find a spot for her there. McCann indicated that she would be willing to go back to production.

## K. McCann declines early retirement

On October 12, Casperson sent McCann an email following up on the early retirement offer and asking about McCann's hands. McCann responded later that day indicating that she would not be taking the early retirement offer and that her hands were "feeling great [since] she got the injections in them, so maybe that did the trick!!!" Dkt. 36-3, at 1.

## L. Reduction in force

Only six employees accepted early retirement, fewer than were necessary to achieve the cost savings that Badger Mining needed. So Badger Mining developed a staffing model based on projected business conditions to identify how many production lines it would need to run

to meet future needs, and how many employees it would need to satisfy those needs. It determined that it needed to eliminate 33 positions, including one R&D position. As head of R&D, Grant was responsible for determining which R&D position to eliminate, subject to final approval from Nighbor and Lori Phillippi (Badger Mining's Co-President and Advisory Team Member).

The Badger Mining handbook lists the following criteria to be considered in making determinations about layoffs:

- Required job functions for production;

- Voluntary layoffs;

- Work habits and attitude;

- Prior work performance.

Dkt. 37-4. In assessing these criteria, Grant looked to the R&D employee performance reviews from 2013 and 2014, her own knowledge and observations regarding each employee, and the feedback she had received from team coaches at Badger Mining. Grant testified that as an initial step, she considered each employee's area of expertise in conjunction with the essential functions of the R&D department. From this she determined that she would not eliminate Breid, Lewis, or Kowahl's positions, because each of them possessed unique areas of expertise.

That left the lab techs—McCann and Coblentz. In deciding between them, Grant says that she considered technical skills (i.e., lab testing and batch mixing abilities), adaptability to change, cultural fit, and ability to troubleshoot problems and work independently. As for their technical skills, Grant says that she concluded that McCann and Coblentz were equally skilled at lab testing, but that McCann had struggled to learn batch mixing. As for adaptability to change, she concluded that McCann had repeatedly questioned changes and expressed

unwillingness to do things in the past, and that she likely would not adapt well to the forthcoming changes at Badger Mining. Grant further concluded that McCann did not demonstrate self-directedness and the ability to troubleshoot on the fly. By contrast, Grant says that she concluded that Coblentz demonstrated an ability to adapt to change, troubleshoot, and work with limited direction, and that he had "a great mind for R&D." Dkt. 92, ¶ 126.

Grant also sought Breid's feedback as to which R&D position should be eliminated. Breid stated that if an R&D position needed to be eliminated, it should be McCann's. She based her recommendation on her perception that McCann had difficulties with problem-solving, listening, and overall temperament.

Based on these considerations, Grant decided to recommend that McCann's position be eliminated. Phillippi and Nighbor reviewed and accepted Grant's recommendation.

**M. Badger Mining declines to transfer McCann to a production lab tech role**

Having decided to eliminate McCann's position in R&D, Grant spoke with plant coaches Jamie Morden and Joe Knutson about the possibility of transferring McCann back to a production lab tech position. At that time, Morden and Knutson were eliminating staff in the production department, and there were no open positions to fill. But Morden and Knutson included McCann's name on a spreadsheet of production lab techs, which they were using to compile feedback about each production employee and determine who to retain. They solicited feedback about McCann from Miller and Rodriguez, who had worked with McCann when she was in the production department. Both provided negative feedback. In the spreadsheet row next to McCann's name, Miller wrote "No, can[']t trust her, shouldn't be moving problems around, instigator, she has not improved with the coaching she has had." Dkt. 42-20, at 2.

Rodriguez wrote "Don't want her, pot stirrer, has had trouble with every lab tech she has worked with." *Id.* Ultimately, Morden and Knutson decided that they would not eliminate an existing member of their team to make room for McCann.

On October 26, 2015, Badger Mining terminated McCann and the other employees whose positions had been eliminated, effective that day. Following the workforce reduction, the remaining four R&D employees—Breid, Lewis, Kowahl, and Coblentz—assumed McCann's former duties.

The court will discuss additional facts where relevant to the analysis.

ANALYSIS

McCann asserts claims under the Americans with Disabilities Act (ADA), 42 U.S.C. § 12112, *et seq.*, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 521, *et seq.*, which make it unlawful for employers to discriminate against employees on the basis of disability and age, respectively. She contends that Badger Mining brought in Coblentz to replace her and eliminated her position because she was disabled (or was regarded by Badger Mining as disabled) due to her hand issues, and because she was 62 years old.

A. **Summary judgment standard**

Summary judgment is appropriate if a moving party "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A party may not simply rely on the allegations in its pleadings to create such a dispute, but must "demonstrate that the record, taken as a whole, could permit

a rational finder of fact to rule in [its] favor." *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 931 (7th Cir. 1996).

## B. Disability discrimination

McCann alleges that Badger Mining discriminated against her at two different decision points: (1) the decision to eliminate her position in R&D, and (2) the decision not to transfer her into a role in the production department.[1] To prevail on these claims under the ADA, she must show that: (1) she is disabled; (2) she is otherwise qualified to perform the essential functions of the job with or without reasonable accommodation; and (3) the adverse job action was caused by her disability. *Monroe v. Indiana Dep't of Transp.*, 871 F.3d 495, 503 (7th Cir. 2017) (quoting *Roberts v. City of Chicago*, 817 F.3d 561, 565 (7th Cir. 2016)). Badger Mining challenges McCann's showing under the first and third prongs.

### 1. Whether McCann was disabled

An individual is "disabled" under the ADA if she: (a) has a physical or mental impairment that substantially limits one or more major life activities; (b) has a record of such an impairment; or (c) is regarded by her employer as having such an impairment. 42 U.S.C. § 12102(1). "Major life activities" include things like "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* § 12102(2)(A). Under the 2008 amendments to the ADA, the term "substantially limits" must be construed broadly in favor of expansive coverage. As a rule, an impairment is a disability under the ADA

---

[1] McCann originally asserted additional ADA claims for failure to accommodate and for discriminatory terms and conditions of employment based on an allegation that she was excluded from meetings because of her disability, but she concedes those claims in response to defendants' motion for summary judgment. *See* Dkt. 84, at 24.

14

"if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting" 29 C.F.R. § 1630.2(j)(1)(i), (ii).

McCann contends that she was disabled under all three versions of the ADA's statutory definition. As for whether she had an impairment or record of an impairment that substantially limited a major life activity, McCann testified that her hand issues prevented her from painting, crocheting, and knitting; required her to take occasional breaks while driving, writing, and mowing the lawn; and caused her to experience cramping, pain, and numbness in her hands and fingers by the time she got off work.[2] As to whether Badger Mining regarded her as disabled, McCann contends that Badger Mining was aware of McCann's hand issues and therefore regarded her as having an impairment that substantially limited a major life activity.

McCann cites no authority suggesting that hobbies like painting, crocheting, and knitting qualify as major life activities under the ADA, and the court can find none. Likewise, McCann does not identify any cases in which driving, writing, or lawn-mowing have been recognized as major life activities. But even assuming that they are, the court is skeptical that the need to take occasional breaks from prolonged driving, writing, or lawn mowing constitutes a substantial limitation as compared to most people in the general population. And McCann's

---

[2] McCann also says that, since her termination, her degenerative arthritis has "resulted in further limitations on activities over time, such as walking her dog on a leash, blow drying/combing her hair, carrying dishes, and carrying groceries." Dkt. 84, at 6. But "[w]hether or not an individual meets the definition of a qualified individual with a disability is to be determined as of the time the employment decision was made." *Bay v. Cassens Transp. Co.*, 212 F.3d 969, 974 (7th Cir. 2000). Evidence of limitations that post-date October 2015 is not relevant.

assertion that Badger Mining regarded her as disabled is undermined by the evidence that she provided Badger Mining with two medical releases indicating that she was able to work without restrictions, *see* Dkt. 92, ¶ 80, and her statement to Casperson on October 12, 2015 that her hands were "feeling great." Dkt. 36-3, at 1.

On the other hand, there is little case law on the question of how to interpret the phrase "substantially limits" in light of the 2008 ADA amendments. Because the scope of the law is uncertain and because the court can resolve the motion for summary judgment on other grounds, the court will assume without deciding that McCann was disabled within the meaning of the ADA during the time at issue.

### 2. Whether McCann's discharge was caused by her disability

To establish the third prong of her ADA claim and survive summary judgment, McCann must adduce sufficient evidence to allow a reasonable jury to find that McCann's disability was the "but for" reason for her termination. *Monroe*, 871 F.3d at 504. Following the guidance in *Ortiz v. Werner Enter., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), McCann relies on several types of evidence to support her claim, including suspicious timing, statements and conduct by Badger Mining management, and pretext. The court will address each of these categories of evidence in turn.

#### a. Suspicious timing

McCann contends that the timing of certain decisions by Badger Mining management raises an inference of discrimination. Temporal proximity alone is rarely enough to preclude summary judgment, *Stone v. City of Indianapolis Pub. Utils Div.*, 281 F.3d 640, 644 (7th Cir. 2002), but when viewed in light of other evidence, timing can raise triable issues. *Coleman v. Donahoe*, 667 F.3d 835, 860 (7th Cir. 2012).

Here, McCann highlights two sets of emails that she says illustrate a suspicious correlation between her September 21 disability disclosure and Badger Mining's decision to eliminate her position. First, she notes that on September 2, Grant was instructed by Badger Mining management to provide a list of cost-cutting ideas for the R&D department, including "any staff reductions," by September 16. Dkt. 42-18, at 1. On September 10, Grant sent a list of potential cost-cutting measures. *See* Dkt. 42-19. The list included a note that McCann "could be an option for early retirement," *id.* at 2, but it didn't propose laying her off. The parties don't identify the specific date on which Badger Mining decided to eliminate McCann's position, but McCann contends that it came on the heels of her September 21 disability disclosure, and she points to Grant's September 10 email as evidence. But that email is not probative of discriminatory intent because it was not clear as of September 10 that layoffs would be necessary. Indeed, Badger Mining hadn't even made offers of early retirement yet. So there would have been no reason to include any layoff proposals in that email.

Second, McCann notes that on September 22—the day after her email disclosing her hand issues—Grant emailed Breid regarding the possibility of transferring Coblentz into R&D. In that email, Grant told Breid that she had "mentioned to [Coblentz] that Rae would be in and out for the next few months" and that they "might need some help" in R&D, but that she "hadn't officially talked to" Breid about the transfer yet. Dkt. 69-7, at 1. McCann contends that this proves that "Coblentz was brought into the R&D Department because of McCann's hand issues," and disproves Badger Mining's contention that the decision to transfer Coblentz was actually made earlier in the summer, prior to McCann's disability disclosure. Dkt. 84, at 12.

There are two problems with McCann's theory. First, Grant's email does not actually contradict Badger Mining's assertion that Grant and Breid had previously been considering transferring Coblentz into R&D. Grant wrote that she "hadn't officially talked to" Breid about the transfer yet, but that doesn't undermine Grant and Breid's testimony that they had been considering and informally discussing the possibility of transferring someone else into R&D for some time. *See* Dkt. 26 (Breid Dep. 36:25–37:1) (testifying that she had discussions with Grant about transferring someone into R&D "as early as probably July or August"); Dkt. 22 (Grant Dep. 32:3–4) (testifying that she and Breid had spoken about the need "to get somebody in to be able to mix batches" during "the summer of 2015"). McCann cites no evidence that contradicts this witness testimony.

A second and more fundamental problem with McCann's theory is that it conflates the timing of Badger Mining's decision to transfer Coblentz to R&D with the timing of its decision to eliminate McCann's position. Neither party disputes that the timing of Coblentz's transfer was directly linked to McCann's disclosure that she might have to miss work for medical reasons: Grant's email to Breid explicitly mentioned the prospect that McCann would be "in and out for the next few months," Dkt. 69-7, at 1, and on October 6, Breid told McCann that they had decided to transfer Coblentz when they did in part because they "didn't know what was happening with [McCann's] hands." Dkt. 30 (McCann Dep. 192:23–24).

But these statements are not evidence of discriminatory intent. They simply show that Badger Mining wanted ensure that the work continued to get done in McCann's absence. Indeed, the ADA may require an employer to provide this type of accommodation in some cases. *See* EEOC Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, 2002 WL 31994335, at *28–29. If Badger Mining

had refused to provide McCann assistance for absences related to her disability, it could have been vulnerable to another claim of disability discrimination. *See Pals v. Schepel Buick & GMC Truck, Inc.,* 220 F.3d 495, 498 (7th Cir. 2000) (reasonable jury could find that employer was required to schedule another employee to "fill in" for disabled employed while she was recovering). So, it was reasonable both from a business perspective (to ensure adequate coverage) and from a liability perspective (to avoid accusations of a failure to accommodate) for Badger Mining to bring another employee into the department. This decision simply provides no support for McCann's discrimination claim.

### b. Badger Mining's response to McCann's hand issues

McCann contends that Badger Mining "erroneously believed, and [was] motivated by the belief, that McCann's physical impairments would preclude [her] from being able to do her job." Dkt. 84, at 13. As evidence, she notes that at the time of the reduction in force, the R&D department had "more than enough work" to keep McCann, Kowahl, and Coblentz busy, which McCann says raises the inference that Badger Mining had concluded that her disability precluded her from performing her job. Dkt. 84, at 15. But this argument ignores the central premise of Badger Mining's reduction in force: The problem was that business conditions made it untenable to continue operating at the same capacity, not that there wasn't enough work to go around.

McCann also points to four email communications in which McCann's hand issues were discussed. The court will address each of these email exchanges. But the basic problem for McCann is that her employer's awareness of her hand issues and attempts to respond to them is simply not evidence of discriminatory animus. To the contrary, the employer should prepare

to accommodate an employee's disability or other need to be absent from work for health reasons.

The first email is Casperson's response to McCann's September 21 disability disclosure, in which she indicated that Greta Gearing would follow up with McCann about FMLA or short-term disability. McCann says that Badger Mining's failure to provide her with that paperwork raises an inference that it did not intend to retain her after she disclosed her medical condition. But neither Casperson nor Gearing were the relevant decision-makers in eliminating McCann's position in R&D. McCann offers no evidence connecting them to the relevant decisionmakers, or otherwise substantiating her theory that their failure to provide paperwork was part of a discriminatory scheme rather than a mere administrative oversight.

The second and third email exchanges cited by McCann are the emails that Casperson sent Breid and Nighbor in late September concerning whether McCann's hand condition might be related to the crush testing she was doing. *See* Dkt. 69-11 (September 22, 2015 email to Breid) and Dkt. 69-13 (September 30, 2015 email to Nighbor). These emails indicate that Badger Mining management took seriously the possibility that McCann's symptoms might be work-related. But, again, simply acknowledging that McCann has a physical condition is not evidence of a discriminatory intent. McCann points to nothing in the emails that suggests that McCann intended to fire her or even that they were frustrated by any perceived disability.

The fourth and final email that McCann highlights is an October 7 exchange between Breid and Casperson, in which Breid summarized her discussion with McCann regarding McCann's concerns that Coblentz was being brought in to replace her. In it, Breid wrote:

> Rae has been having hand issue[s] as of late and had to miss most of last week to accommodate the problems. It was decided that since we were already looking to bring in a 3rd person to help with

> testing and mixing batches that now would be a good time since
> [it is] up in the air with when/if Rae would be able to work.

Dkt. 69-6, at 2. McCann says this email shows that Breid did not believe that McCann would be able to continue working at Badger Mining and was therefore angling to push her out. But Badger Mining's decision to transfer Coblentz to R&D does not raise an inference that its decision to eliminate her position in the reduction in force was discriminatory. If anything, it shows that Badger Mining was making efforts to accommodate her disability by ensuring full coverage in case McCann had to miss work. McCann points to nothing in this email or any other Badger Mining communication suggesting that McCann was going to be fired or replaced because of her disability.

### c. Pretext

The parties devote the bulk of their briefs to the question of pretext. Evidence that the employer is lying about its reasons for taking an adverse action can support a discrimination claim, because it suggests that the employer may be trying to cover up a reason that is prohibited by law. *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 147 (2000). But to raise a genuine issue of material fact about pretext, it is not enough for McCann to adduce evidence that Badger Mining might have been wrong or unfair in its assessment of her work performance. *Coleman*, 667 F.3d at 852. She must instead "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in Badger Mining's stated reasons "that a reasonable person could find [them] unworthy of credence." *Id*. (quoting *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 791 (7th Cir. 2007)).

In this case, McCann was laid off as part of a reduction in force that affected 32 other Badger Mining employees. McCann does not allege that the reduction in force itself was a

pretext for getting rid of disabled workers. Rather, she contends that Badger Mining would not have included her in the reduction in force but for her disability.

Badger Mining says that Grant selected McCann for the reduction based on her conclusions that Breid, Lewis, and Kowahl possessed unique expertise in areas that were essential to the R&D department; that McCann could not competently perform batch mixing, a critical function; and that McCann's work habits, attitude, and general aptitude for R&D work were inferior to those of Coblentz, the only other employee similarly situated to her. McCann does not challenge Grant's conclusion that Breid, Lewis, and Kowahl possessed unique expertise that was essential to the work of the R&D department, *see* Dkt. 92, ¶¶ 117–21,[3] but she vigorously disputes Grant's other asserted rationales and contends that a reasonable jury could find them to be pretextual, for several reasons. *Widmar v. Sun Chem. Corp.*, 772 F.3d 457, 465 (7th Cir. 2014) ("An employee can demonstrate that the employer's reasons are not credible through evidence showing that the proffered reasons had no basis in fact, were insufficient to motivate discharge, or did not actually motivate his discharge.").

    i.    **Lab testing skills**

McCann says that Grant's stated conclusions about McCann and Coblentz's relative skills and attributes are so baseless that a reasonable jury would find them unworthy of credence. For instance, she contends that it is "implausible" that Grant could have concluded that McCann and Coblentz were equally skilled in lab testing given that McCann had more

---

[3] In other parts of her brief, McCann alleges that Kowahl had problems with anger management and a history of other disciplinary problems, which she says is evidence that Badger Mining's asserted concerns about her team fit and temperament were pretextual. *See* Dkt. 84, at 21–22. But because McCann doesn't deny that Badger Mining considered Kowahl's expertise to be indispensible, evidence about Kowahl's alleged interpersonal problems doesn't show pretext.

years of materials lab testing and lab technician experience than Coblentz did. Dkt. 84, at 17. But years of experience do not necessarily correlate with level of skill, and McCann adduces no evidence that anyone other than she viewed Coblentz's lab testing skills as inferior to hers. As a rule, "a plaintiff's own opinions about her work performance or qualifications do not sufficiently cast doubt on the legitimacy of her employer's proffered reason for its employment actions." *Millbrook v. IBP, Inc.*, 280 F.3d 1169, 1181 (7th Cir. 2002) (quoting *Ost v. West Suburban Travelers Limousine, Inc.*, 88 F.3d 435, 441 (7th Cir. 1996)).

### ii.    No written records

McCann also notes that there are no written records reflecting Grant or Breid's analysis of McCann and Coblentz's respective abilities, or indicating when exactly Grant arrived at the decision to recommend that McCann be terminated. McCann argues that if Badger Mining made its decision based on nondiscriminatory criteria, its analysis, reasoning, and timing "would have been set forth in writing, at least in an e-mail, consistent with the directives from the Advisory Team." Dkt. 84, at 15. But McCann doesn't cite any company policies that required Badger Mining to put its reasoning in writing and she doesn't identify examples of other laid off employees who were handled differently. So no inference can be drawn from the absence of a written record of Grant's decision-making process.

### iii.    Batch mixing skills

One of Badger Mining's asserted reason for its decision to eliminate McCann's position was that she struggled to competently perform batch mixing. McCann contends that she did not struggle with it, and that the reason Breid didn't have her continue mixing batches after the initial training and mixing session was because ISO crush testing was the higher priority. Because this fact is disputed, the court will construe it in the light most favorable to McCann.

23

But this one dispute is not enough to defeat Badger Mining's summary judgment motion. To create a genuine issue of material fact on the issue of intent, McCann must demonstrate that *all* of Badger Mining's reasons are pretextual. *Garofalo v. Vill. of Hazel Crest*, 754 F.3d 428, 439 (7th Cir. 2014).

### iv.     Self-direction and troubleshooting skills

McCann next disputes Badger Mining's assertion that she lacked self-directedness and independent troubleshooting skills. She notes that beginning in May of 2015, she started working night shifts, performing her duties alone and without direction. She also stopped attending regular R&D department meetings, which occurred during the daytime. McCann argues that Breid and Grant wouldn't have allowed this if they truly believed that she lacked self-direction and troubleshooting abilities. But in McCann's 2014 performance appraisal, Breid expressed concerns that "if everything isn't written down in the exact right order Rae will have questions and not proceed until they are answered." Dkt. 42-4, at 2. Badger Mining allowed McCann to start working the night shift a few weeks later, but that does not raise an inference that these concerns had abated. McCann says that she voluntarily sought to transfer to the night shift to avoid having to interact with Kowahl. Dkt. 92, ¶ 229. Badger Mining's decision to honor McCann's preference raises an inference that it was seeking to resolve conflict between its employees, not that it had gained confidence in McCann's self-directedness and troubleshooting abilities.

### v.     Adaptability to change

As for Badger Mining's assertion that McCann was terminated in part because she had difficulty adapting to a changing work environment, McCann points to Grant's asserted conclusion that McCann had "repeatedly question[ed] changes" and expressed

"unwilling[ness] to do things," Dkt. 92, ¶ 124, and notes that Badger Mining fails to cite any specific examples of these alleged problems. But McCann's 2013 and 2014 performance appraisal both reflect concerns about her ability to adapt to new situations. *See* Dkt. 42-3, at 3 ("Some new things are alarming to Rae, (changes in documentation and routine) but she does get there"); Dkt. 42-4, at 2 ("If a communication is not how Rae was expecting it she has trouble understanding. I feel that if everything isn't written down in the exact right order Rae will have questions and not proceed until they are answered."). Badger Mining raised these concerns well before McCann disclosed any problems with her hands, so the lack of specific examples does not raise an inference of discrimination.

### vi.     Team fit and temperament

McCann contends that Badger Mining's purported concern with team fit and temperament are pretextual because, if those criteria really mattered, Badger Mining would have laid off Coblentz instead. According to McCann, Coblentz was disliked by his coworkers and had once received formal coaching about his interactions with a colleague. But Grant testified that she had no knowledge that Coblentz had any issues with his coworkers. Dkt. 22 (Grant Dep. 43:10–15). McCann speculates "that Rodriguez informed Breid and Grant of these issues," Dkt. 84, at 22, but "[s]peculation does not defeat summary judgment." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1089 (7th Cir. 2018). McCann points to no evidence to undermine Badger Mining's assertion that Grant harbored good faith concerns about McCann's team fit and temperament. Those issues were documented in performance appraisals and emails that long predate McCann's disclosure of her hand issues.

McCann has failed to provide evidence that all of Badger Mining's asserted reasons for eliminating her position were pretextual. Because no reasonable jury could conclude that

Badger Mining eliminated McCann's position in R&D because of her disability, the court will grant Badger Mining's motion for summary judgment on that claim.

### 3. Whether the decision not to retain McCann as a lab tech in the production department was caused by her disability

McCann asserts a separate claim of disability discrimination based on Badger Mining's decision not to retain her as a lab tech in the production department. This decision not to recommend McCann for a production position was made by Morden and Knutson, neither of whom was aware that McCann was experiencing issues with her hands.[4] But McCann contends that the relevant decision-makers also included Casperson, who consulted with Morden and Knutson about their retention recommendations, and Nighbor and Phillippi, who made the ultimate decision to accept Morden and Knutson's recommendations. Dkt. 89, ¶¶ 236–39. Casperson, Nighbor, and Phillippi all knew about McCann's medical condition, but McCann adduces no evidence that any of them exerted any influence over Morden and Knutson's recommendation.

Even assuming that Casperson, Nighbor, and Phillippi somehow influenced the decision-making process, McCann fails to adduce any evidence from which a reasonable jury could infer that the decision not to make room for her in the production department was motivated by discriminatory animus. Instead, she objects that Badger Mining's decision-making process was unfair. But courts do not sit "as a super-personnel department, second-guessing an employer's business decisions." *Coleman*, 667 F.3d at 862 (citations and quotation marks omitted). McCann challenges three aspects of Badger Mining's decision-making process,

---

[4] On September 29, 2015, Morden received an email that mentioned that McCann was "experiencing ergonomic health issues," Dkt. 89, ¶ 111, but he testified that he did not know what those issues were. Dkt. 23 (Morden Dep. 44:13–46:22).

but none of these challenges create triable issues of fact about whether Badger Mining's decision not to offer her a position in the production department was discriminatory.

First, Morden and Knutson decided to recommend against McCann's retention based on the negative feedback from Miller and Rodriguez, who had worked with McCann prior to her transfer to R&D in 2013. McCann contends that their feedback was based almost entirely "on hearsay, assumptions, and speculation," and that Morden and Knutson were wrong to rely on information that "was outdated and, therefore, meaningless." Dkt. 84, at 26. But that is simply irrelevant. Again, "[t]he pretext inquiry asks not whether an employer correctly believed an employee was performing poorly, but rather whether the employer honestly believed so." *Arrigo v. Link*, 836 F.3d 787, 796 (7th Cir. 2016). McCann does not contend that Miller and Rodriguez knew about her alleged disability and has adduced no evidence that their input was motivated by discriminatory intent.

Second, McCann says that, had Morden and Knutson been considering McCann in good faith, "they would have asked Grant about McCann's work performance or reviewed her performance review for 2014, like they did with production employees." *Id.* But McCann was seeking to transfer into production from another department. It is not surprising that Morden and Knutson would solicit feedback from the production team coaches who had last worked with McCann to gauge whether she would be a good fit for production. McCann points to no evidence to suggest that Morden and Knutson's evaluation methodology was bad faith or pretextual.

Third, McCann contends that a reasonable jury could infer discriminatory animus based on the makeup of the production employees that Badger Mining decided to retain. Several of the production employees listed on the spreadsheet were retained despite negative feedback

and disciplinary history. But McCann was not a production lab tech, and thus was not similarly situated to the production lab techs. *See Boumehdi*, 489 F.3d at 791 ("A similarly situated employee is one who is directly comparable to the plaintiff in all material respects." (citation, quotation marks, and alterations omitted)). Permitting McCann to transfer into production would have required bumping an additional production lab tech to make room. Given that the feedback about McCann was uniformly negative, Morden and Knutson's decision not to bump another lab tech to make room for McCann does not raise an inference of discrimination. *See Dunderdale v. United Airlines, Inc.,* 807 F.3d 849, 856 (7th Cir. 2015) ("[A]n employer is not required to 'bump' other employees to create a vacancy so as to be able to reassign the disabled employee." (internal quotation marks omitted)).

The court concludes that no reasonable jury could find based on this record that Badger Mining's decision not to retain McCann in the the production department was motivated by her disability. So it will grant Badger Mining's motion for summary judgment on that claim as well.

## C. Age discrimination

McCann devotes less than two pages of her brief to her age discrimination claim. She concedes that summary judgment is appropriate on the age discrimination claim arising out of the decision not to retain her as a lab tech in production, but contends that a reasonable jury could conclude that the decision to eliminate her position in R&D was motivated in part by her age. As evidence, she asserts that "the facts in the record indicate that Coblentz replaced McCann." Dkt. 84, at 29. At the time of the reduction in force, McCann was 62, and Coblentz was 41. But McCann points to no specific evidence beyond the mere fact of their ages that

would support an inference of age discrimination.[5] Instead, she merely incorporates her prior arguments about pretext, which the court has already rejected. *See supra*, Section (B)(2)(c). So the court will grant Badger Mining's motion for summary judgment on McCann's age discrimination claim as well.

ORDER

IT IS ORDERED that:

1. Defendant Badger Mining Corporation's motion for summary judgment, Dkt. 32, is GRANTED.

2. The clerk of court is directed to enter judgment in favor of Badger Mining and close this case.

Entered June 28, 2019.

BY THE COURT:

/s/

_____
JAMES D. PETERSON
District Judge

---

[5] In her proposed findings of fact, McCann highlights allegedly ageist comments made by Rodriguez to another employee, Paulann Hart. Dkt. 89, ¶¶ 245–49. But McCann does not mention these comments in her brief or explain how they are relevant to the decision to eliminate McCann's position in R&D.